IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KHRISTOPHER PEPPER,

    Petitioner,

    v.

COVINGTON SPECIALTY
INSURANCE COMPANY, et al.,

    Respondents.

CIVIL ACTION FILE
NO. 1:16-CV-693-TWT

**OPINION AND ORDER**

This is a declaratory judgment action. It is before the Court on the Respondent Prime Rate Premium Finance Corporation, Inc.'s Motion for Summary Judgment [Doc. 41] and the Respondents Covington Specialty Insurance Company and RSUI Indemnity Company's Motion for Summary Judgment [Doc. 43]. For the reasons stated below, Prime Rate's Motion for Summary Judgment [Doc. 41] is GRANTED and Covington and RSUI's Motion for Summary Judgment [Doc. 43] is GRANTED.

**I. Background**

On October 9, 2013, the Petitioner Khristopher Pepper was shot in the arm while visiting the gas station located at 4160 Fulton Industrial Boulevard, Atlanta,

Georgia.[1] The gas station was owned at the time by Petroleum Realty, II, LLC and Florida Fuel Partners, LLC, and was leased to ASI Retail & Sales, Inc.[2] Prior to the shooting, on March 19, 2013, Covington issued a Commercial General Liability Policy to ASI with a policy period from February 28, 2013 to February 28, 2014.[3] In order to pay the premium on the Policy, ASI entered into a premium finance agreement with Prime Rate, in which Prime Rate agreed to advance the loan proceeds for the full premium.[4] In addition, the premium finance agreement gave Prime Rate power of attorney with authority to cancel the Policy if the insured failed to pay the monthly loan payment within fifteen days of the due date.[5]

On June 3, 2013, having not received that month's required payment, Prime Rate mailed a "10 Day Notice of Intent to Cancel" the Policy to ASI, stating that the

---

[1] Respondents Covington and RSUI's Statement of Material Facts ¶ 1 [hereinafter "Covington SOF"].

[2] The property was first leased to Mitamurshed Enterprise and Petroleum Realty DBA, which eventually became ASI.

[3] Id. at ¶ 3. While the Policy was originally given to Mitamurshed, a Policy Endorsement was eventually issued amending the declaration page to change the named insured from Mitamurshed to ASI. The Endorsement also added Petroleum Realty and Florida Fuel Partners, the owners of the gas station property, as additional insureds under the Policy. Id. at ¶ 7.

[4] Id. at ¶ 4.

[5] Id. at ¶ 5.

Policy would be canceled effective June 18, 2013, for nonpayment unless payment was received before that date.[6] That date came and went, and having still not received payment, Prime Rate mailed a Notice of Cancellation to ASI and requested that Covington cancel the Policy.[7] Accordingly, Covington canceled the Policy, effective June 18, 2013.[8]

As stated above, Pepper was shot in the arm while at the gas station in October.[9] Nearly two years after the shooting, on August 11, 2015, Pepper filed his Complaint in the underlying personal injury action against ASI, Petroleum Realty, and Florida Fuel Partners.[10] RSUI – Covington's parent company – issued a coverage disclaimer to ASI on September 29, 2015, denying coverage because the Policy had been canceled prior to the shooting.[11] Eventually, the parties mediated the underlying action and arrived at three settlements.[12] In the first settlement, ASI agreed to a consent

---

[6] Id. at ¶ 9.

[7] Id. at ¶¶ 10-11.

[8] Id.

[9] Respondent Prime Rate's Statement of Material Facts ¶ 20 [hereinafter "Prime Rate SOF"].

[10] Id. at ¶ 21.

[11] Id. at ¶ 23.

[12] Id. at ¶ 24.

judgment in favor of Florida Fuel Partners and Petroleum Realty for $1,500,000 and ASI's rights to recovery from the Policy.[13] In the second settlement, ASI and Pepper entered into a separate consent judgment in favor of Pepper, also for $1,500,000 and ASI's rights in the Policy.[14] And in the third settlement, Florida Fuel Partners and Petroleum Realty agreed to assign their rights in the first consent judgment against ASI to Pepper.[15] In short, after all the settlements were entered into, Pepper was left with the right to recover up to $1,500,000 from the Policy.

Pepper then filed the current action against Covington, RSUI, and Prime Rate on March 4, 2016, pursuant to the rights he received via the settlement. At issue is whether the Respondents Covington and RSUI were required to defend ASI, Florida Fuel, and Petroleum Realty in the Petitioner's underlying lawsuit seeking compensation for personal injuries, and whether the Respondent Prime Rate is liable in any way for canceling the Policy. Pepper seeks a declaratory judgment stating that the cancellation of the Policy was defective and that it should have been in effect at the time of the shooting. As a result, Pepper also seeks an award from the Respondents in an amount equal to the Settlement Agreements.

---

[13] Id. at ¶ 25.

[14] Id. at ¶ 26.

[15] Id. at ¶ 28.

## II. Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[16] The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.[17] The party seeking summary judgment must first identify grounds to show the absence of a genuine issue of material fact.[18] The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.[19] "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."[20]

---

[16] FED. R. CIV. P. 56(a).

[17] Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

[18] Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

[19] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

[20] Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).

## III. Discussion

**A. Wrongful Cancellation of the Policy**

Put simply, the Petitioner argues that Prime Rate improperly canceled the Policy, the Policy should have been in effect at the time of the shooting, and that as a result one or all of the Respondents should have to pay Pepper for his injuries, as determined by the Settlement Agreements. There can be no doubt that the cancellation notice was inadequate under Georgia law. When premium finance companies, like Prime Rate, seek to exercise power of attorney to cancel an insurance policy, Georgia law imposes certain notice requirements they must comply with first.[21] At least ten days before canceling a policy, a premium finance company must notify the insured of its intent to do so (known as the "10 Day Notice").[22] At the end of that 10 day period, it must then notify the insured that its policy is actually being canceled (the "Cancellation Notice").[23]

It is this latter notice that has created the problem in this case. Georgia law not only requires that the Cancellation Notice be sent, but also specifies some of the

---

[21] O.C.G.A. § 33-22-13.

[22] Id. § (b).

[23] Id. § (c)(1).

information it must contain.[24] In particular, the statute states that the Cancellation Notice "*shall* inform the insured that any payment received after the mailing or delivery of notice to the insurance company to cancel the policy will not reinstate the policy."[25] In this case, the Cancellation Notice contained no such statement.[26] Although the Cancellation Notice did inform the insured that the Policy would be canceled if payment was not received, it did not inform the insured that the Policy would not be reinstated should payment be received after the due date. Consequently, because the statute requires this information to be included in a Cancellation Notice, the Policy was wrongfully canceled.

### B. Respondents' Potential Liability

After determining that a policy was wrongfully canceled, the question becomes which parties are liable, if any, for the improper cancellation. Many states have statutes similar to Georgia's that require premium finance companies to follow certain procedures before canceling an insurance policy. Often, the language of these statutes is nearly identical to O.C.G.A. § 33-22-13.

---

[24] Id.

[25] Id. (emphasis added).

[26] See Prime Rate's Resp. to Pepper's Mot. for Summ. J., June 19, 2013 Notice of Cancellation, Ex. H. [Doc. 41-8].

Among these states, there have emerged two approaches to assigning liability for a failure to properly notify a policyholder. The first approach, as followed by New York, New Jersey, and Connecticut, places liability upon the insurance company.[27] These courts hold that this is the appropriate remedy, despite the lack of wrongdoing on the part of the insurance company, for two basic reasons. First, the purpose of these statutes is to prevent these situations from coming up in the first place. The statutes requiring "notice of intent to cancel is intended to help an insured keep his policy from lapsing, not to give him recourse against a finance company once the hardships of not having coverage have already befallen him."[28] These courts reason that allowing insurance companies to escape all liability after the fact would put the insured in a worse position than he had been before through no fault of his own.

Secondly, these courts fear that public policy would be undermined by placing such a potentially large burden on premium finance companies. Liability for an entire insurance policy is grossly disproportionate to the potential profits made from the

---

[27] See Precision Mech. Servs., Inc. v. T.J. Pfund Assocs., Inc., No. CV98-0416692, 2003 WL 21659672, at *1 (Conn. Super. Ct. June 19, 2003); Basic Image, Inc. v. Transamerica Ins. Fin. Corp., 241 A.D.2d 424, 426, 660 N.Y.S.2d 433 (1997); Kende Leasing Corp. v. A.I. Credit Corp., 217 N.J. Super. 101 (App. Div. 1987).

[28] Precision Mech. Servs., 2003 WL 21659672, at *6 (internal quotations omitted).

interest on a premium finance loan. The worry for these courts is that "[f]aced with such additional potential liability, 'qualifying banks and lending units might well decline to act as premium financing agencies.'"[29] After all, it is the insurance company that is in the business of providing insurance, not the premium finance company. As the Basic Image court put it, "the premium financing agency does not 'buy the risk.'"[30]

This was also Georgia's approach prior to 1995.[31] But in that year, the Georgia legislature added subsection (c)(2) to O.C.G.A. § 33-22-13, which reads:

> The receipt of the [Cancellation Notice] by the insurer shall create a conclusive presumption that the premium finance company has fully complied with all the requirements of this Code section, that the insurer is entitled to rely on such presumption, and that the cancellation of the insurance contract or contracts is concurred in and authorized by the insured. *No liability of any nature whatsoever* shall be imposed upon the insurer as a result of . . . the failure of the insurance premium finance company to comply with any of the requirements of this Code section.[32]

The Eleventh Circuit, in a two page unpublished *per curiam* opinion interpreted this language to mean that not only are insurance companies shielded from any

---

[29] Id. at 427 (quoting Home Mut. Ins. Co. v. Broadway Bank & Trust Co., 53 N.Y.2d 568, 577, 428 N.E.2d 842, 846 (1981)).

[30] Basic Image, 241 A.D.2d at 426, 660 N.Y.S.2d at 435.

[31] See, e.g., Georgia Mut. Ins. Co. v. Gardner, 205 Ga. App. 458, 459 (1992) (affirming judgment against insurer where the premium finance company had failed to comply with notice requirements).

[32] O.C.G.A. § 33-22-13.

tortious or contractual liability arising from a wrongful cancellation, but they are also relieved of any responsibilities under a policy that was wrongfully canceled.[33] In other words, regardless of whether a policy was canceled properly or not, the die is cast, so to speak. Thus, the Policy having been canceled after Covington and RSUI received a cancellation notice from Prime Rate, Covington and RSUI are both off the hook for the Policy.

The alternative approach some states have taken, including Illinois and Vermont, places liability upon the premium finance company.[34] In <u>Carr v. Peerless Ins. Co.</u>, the Supreme Court of Vermont found that statutory language nearly identical to Georgia's included an implied right of action against the premium finance company.[35] Following the factors the Supreme Court laid out in <u>Cort v. Ash</u>,[36] the Supreme Court of Vermont found that the statute was intended to provide protections

---

[33] <u>Kolencik v. Stratford Ins. Co.</u>, 195 F. App'x 855, 857 (11th Cir. 2006) ("regardless of whether [the insured] was in default at the time [the Defendant] received the notice, the premium finance statute insulates [the Defendant] from liability..."). Though not binding, the Eleventh Circuit's opinion is persuasive given the lack of other authority addressing the issue.

[34] <u>See</u> <u>Universal Fire & Cas. Ins. Co. v. Jabin</u>, 16 F.3d 1465, 1468 (7th Cir. 1994); <u>Carr v. Peerless Ins. Co.</u>, 168 Vt. 465, 473 (1998) ("...we conclude that we should infer the existence of a private right of action in favor of the insured and against the premium finance company.").

[35] <u>Id.</u>

[36] <u>See</u> <u>Cort v. Ash</u>, 422 U.S. 66 (1975).

to insureds, and allowing a private right of action was "necessary to enforce the prohibition on the cancellation of the insurance by the premium finance company without giving proper notice."[37] Those two factors, in addition to the culpability of the premium finance company as the wrongdoer, led Vermont and Illinois to allow suit against premium finance companies, up to and including the limit on the insurance policy in question.

However, this option also seems to be foreclosed. Georgia has taken a strong stance against implied causes of action. In 2010, Georgia enacted O.C.G.A. § 9-2-8(a), which states that, "[n]o private right of action shall arise from any Act enacted after July 1, 2010, unless such right is expressly provided therein."[38] Though O.C.G.A. § 33-22-13 was enacted well before July 1, 2010, the clear opinion of Georgia's lawmakers "certainly counsels against...find[ing] new implied civil causes of action."[39] Of course, this does not prevent the Petitioner from seeking to recover using some other cause of action, such as those found in the laws of torts or contract. But given Georgia's clear policy against implied causes of action, and the lack of any authority indicating otherwise, this Court finds that there is no implied cause of action

---

[37] Carr, 168 Vt. at 474.

[38] O.C.G.A. § 9-2-8(a).

[39] Anthony v. Am. Gen. Fin. Servs., Inc., 287 Ga. 448, 459 (2010) (finding that there was no implied civil cause of action arising from a criminal statute).

on the part of a third party beneficiary of the insurance contract for failure to adhere to the requirements of O.C.G.A. § 33-22-13 when the policy has in fact been canceled. Prime Rate's motion for summary judgment must therefore be granted.

## IV. Conclusion

For the reasons stated above, the Respondent Prime Rate's Motion for Summary Judgment [Doc. 41] is GRANTED, and the Respondents Covington and RSUI's Motion for Summary Judgment [Doc. 43] is GRANTED.

SO ORDERED, this 22 day of June, 2017.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge